U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - LAKE CHARLES

**MAR 1 5 2007**

ROBERT H. SHEMWELL, CLERK
BY _____
              DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| LOUISIANA PIGMENT CO., ET AL | : | DOCKET NO. 05-1840 |
| VS. | : | JUDGE TRIMBLE |
| FOUNDATION SYSTEMS, INC. | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Before the Court are two (2) motions: "Louisiana Pigment Co., L.P.'s Motion for Partial Summary Judgment" (doc. #31) and "Motion for Summary Judgment" (doc. #33) filed by defendant, Foundation Systems, Inc. ("FSI"). The motion by Louisiana Pigment Co., L.P. ("LPC") seeks to have this Court enter partial summary judgment in its favor granting LPC's overpayment claims. LPC also moves for summary judgment to dismiss the counterclaims asserted against it by FSI. The motion by FSI seeks to dismiss any and all claims against it asserted by LPC because all claims are prescribed.

## FACTUAL STATEMENT

LPC owns and operates a pigment manufacturing plant located in Westlake, Louisiana. One large cost in the manufacture of pigment is electricity, typically millions of dollars each year. FSI, a Pennsylvania corporation, is an engineering and consulting group that assists clients in lowering their electric costs. Typically, FSI is paid for its services based on a percentage of the savings they achieve for their client by obtaining lower energy costs for the client.

On or about October 25, 1998, FSI and LPC entered into an agreement entitled "Shared

Savings Service Agreement Covering Energy Purchase Contract Negotiations" (the "Agreement") which provided for compensation to be paid by LPC to FSI in the event that FSI's efforts led to the successful negotiation of a new contract with LPC's energy provider, Entergy Gulf States Utilities ("Entergy"). The compensation formulas are set forth in Section IV of the Agreement and essentially provide FSI a percentage of the savings achieved by LPC. Savings are calculated by comparing the new negotiated rate for energy to the old rate under which LPC paid for its energy before FSI began advising the company.

FSI offered several energy strategies for consideration. With FSI's assistance, a new agreement with Entergy was negotiated and went into effect in September 2000. Under the old agreement with Entergy, power was provided to LPC under the High Load Factor Service ("HLFS") and under the new agreement, effective September 2000, power was provided to LPC under a "Site-Specific" contract. According to FSI's analysis, the new contract with Entergy would provide substantial savings compared to the HLFS rate.

After entering into the new Site Specific agreement with Entergy, LPC calculated and accumulated the fees it believed were owed to FSI based on the formulas set forth in the Agreement at section IV.[1] Section IV of the agreement contains the following formula:

$$APS^2 = \frac{C-D}{C} \times 100\%$$

Where:

C=      the projected total electricity cost, for the applicable quarter, for the
        LPC Site based on the most favorable applicable published industrial

---

[1] These fees were based on the cost differences between the old HLFS rate and the new Site-Specific rate. The cost of electricity from Entergy is divided into several components, one of largest components being the "fuel adjustment."

[2] Actual Percentage Savings

2

rate schedule available at the time from GSU and the actual electricity consumption at the LPC Site for the applicable quarter, (excluding applicable taxes and **fuel adjustments common to both C & D rates)** and

D=   the actual total electricity cost for the LPC Site as billed to LPC by GSU under the Negotiated Energy Agreement for the applicable quarter (excluding applicable taxes and **fuel adjustments common to both C& D rates)**.[3](emphasis added)

These facts are undisputed.

The language at issue in the contract relates to the calculation of FSI's compensation under the Agreement. FSI was to be paid a portion of the savings obtained by LPC if it entered a new and beneficial contract with Entergy for providing electrical power. The savings under the contract is calculated by comparing the standard rate at which LPC would have received and paid for its electricity (the "C" rate) versus the negotiated rate (the "D" rate). The projected total cost is compared to the actual total cost to determine savings. The formula requires that  the "fuel adjustments common to both" be excluded from the standard rate and the negotiated rate.

LPC asserts that throughout the time of the negotiation for the new contract with Entergy, and through early 2005, LPC believed that the fuel adjustment under the HLFS rate and the Site-Specific rate were the same, i.e., they were *common to both the C and D rate*. Hence, when LPC calculated the amounts owed to FSI, it excluded the fuel adjustment from its calculations.[4]

---

[3] Section IV. COMPENSATION, BILLING AND PAYMENT of the Shared Savings Services Agreement, dated October 25, 1998, p. 3., Exhibit 10 to J. Fetter Deposition, Plaintiff's Exhibit A.

[4] See Affidavit of Cisneros, Exhibit B, ¶ 9.

3

LPC maintains that pursuant to the Agreement,[5] FSI was supposed to perform the calculations to determine the amount it was owed and invoice LPC on a regular basis for these amounts.  LPC then asserts that FSI failed to bill LPC from September 2000 until February 2003.  LPC asserts that it repeatedly sent FSI its own calculations of the amount it believed was owed FSI under the Agreement.  FSI sent its first invoice on February 20, 2003;[6] the FSI invoice was identical to the calculations made by LPC.  This process continued until February 2005.[7]

In September 2004, LPC asserts that it discovered that the fuel adjustment for the HLFS rate and the Site Specific rate were not the same, i.e., were not common to both C and D.  In March 2005, LPC renegotiated with Entergy and returned to the HLFS rate.  LPC maintains that it recalculated the fees by adding in the two different fuel adjustments to the comparison of the HLFS to the Site-Specific rates, and determined that it over paid FSI by $131,866.   FSI admits that the inclusion of fuel adjustments as a variable in calculations performed under Section IV of the Agreement changes those calculations.[8] However, in its Answer, FSI denies the existence of any overpayment by LPC.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact

---

[5] Section IV of the Agreement provides that "FSI shall calculate the APS and invoice LPC quarterly."

[6] Plaintiff's Exhibit A, p. 123-124.

[7] Plaintiff's Exhibit B, Affidavit fo Cisneros, ¶ 10.

[8] FSI's Response to LPC's Statement of Material Facts, ¶ 6.

and that the moving party is entitled to judgment as a matter of law."[9] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[10]  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[11] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[12]  Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[13]  The burden requires more than mere allegations or denials of the adverse party's pleadings.  The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[14]  There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[15]  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[16]

---

[9]  Fed. R.Civ. P. 56(c).

[10]  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

[11]  *Stewart v. Murphy,* 174 F.3d 530, 533 (5th Cir. 1999).

[12]  *Vera v. Tue,* 73 F.3d 604, 607 (5th Cir. 1996).

[13]  *Anderson,* 477 U.S.  at 249.

[14]  *Celotex Corp. v.  Catrett,* 477 U.S. 317, 324 (1986).

[15]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

[16]  *Anderson,* 477 U.S. at 249-50.

## LAW AND ANALYSIS

*Prescription*

FSI maintains that all claims against it have prescribed and/or are barred by the statute of limitations. FSI also maintains that Pennsylvania law governs pursuant to a choice of law provision agreed to by the parties in the Agreement.[17]   LPC maintains that regardless of which law is applied, Louisiana or Pennsylvania, its causes of actions were viable at the time this suit was filed in September 2005.

LPC asserts two claims; (1) the return of overpayments made by LPC to FSI, and (2) for breach of the Agreement by FSI due to its failure to adequately advise LPC related to its negotiations with Entergy of the differences in fuel adjustments that applied to HLFS rates and the Site-Specific rates. FSI maintains that LPC's causes of actions sound in tort and are subject to Pennsylvania's two year statute of limitations.[18]   LPC maintains that its causes of actions sound in contract.   The prescriptive period for contracts under Pennsylvania law is four years.[19]

First, the claims asserted by FSI would not have existed were it not for the Agreement (contract) executed by the parties.  Even though LPC is asserting that FSI was negligent by not advising it of the difference in fuel adjustments, the contract language itself required that "FSI will

---

[17]  IX. GOVERNING LAW

This Agreement shall be governed in accordance with the law of the State of Pennsylvania.

Defendant's Exhibit B5.

[18]  42 Pa.C.S.A. § 5224; Louisiana's prescriptive period is one year.

[19]  42 Pa.C.S.A. § 5525; Louisiana's prescriptive period is ten years.

perform its services in accordance with the standards of care and diligence normally practiced by recognized firms in performing similar services."[20]   Thus, the claims are based in contract and subject to either a four year prescriptive period applying Pennsylvania law or a ten year prescriptive period applying Louisiana law.[21]

FSI maintains that LPC's cause of action arose when the contract with Entergy was signed – March 27, 2000.  An action accrues when the contract is breached, not when the contract is signed.[22]  LPC made its first alleged overpayment to FSI under the Agreement by check dated 26, 2003.[23]  Thus, without having to decide which states' law of prescription applies, the Court can conclude that the filing of suit on October 14, 2005 was well within the prescriptive period of both states' laws.

*Overpayment Claim*

LPC maintains that there is no genuine issue of fact regarding its claim of an overpayment made to FSI in the amount of $131,866.00.  In late 2004, LPC learned from Entergy, for the first time, that the rates it was being charged for its electricity by Entergy under its Site-Specific rate were in fact higher than the rates it would receive under the standard HLFS rate.  Entergy informed LPC that the fuel adjustment rate between the HLFS and its Site-specific rate were not the same.[24]  LPC asserts that because the fuel adjustment applied to the old HLFS rate was different than the fuel

---

[20]  Exhibit B1 to FSI's Mem.

[21]  See *Sadtler v. Jackson-Cross co.,* 587 A.2d 727 (Pa.Supr. 1991).

[22]  *Sadtler,* 587 A.2d at 731.

[23]  Affidavit of Cisneros, Exhibit 1.

[24]  Plaintiff's Exhibit B, ¶ 11.

adjustment applied to its Site-Specific rate, the proper calculation under Section IV of the Agreement requires adding in the differing fuel adjustments (as opposed to excluding as was originally calculated). The new calculations made by LPC's accountant, Richard Cisneros, reveal that LPC's savings over its old rate were much less than originally calculated. Hence, its shared savings with FSI were much less resulting in the overpayment of fees to FSI.

FSI does not dispute the fact that the fuel adjustments were not the same. FSI maintains that the existence of the alleged overpayments depends upon a finding that the phrase "excluding applicable taxes and fuel adjustments common to both C & D rates" contained within the Agreement is clear and unambiguous and can only be interpreted in a manner favorable to PLC's position. FSI argues that a proper interpretation of the contract hinges on the parties intended meaning of the word "common." FSI then argues that there are numerous meanings of the word "common" which results in other permissible inferences regarding the parties intended meaning of the phrase "excluding applicable taxes and fuel adjustments *common* to both C & D rates. FSI then provides the court with numerous definitions of the word "common" and suggests that such definitions impart a different meaning to the phrase than is suggested by LPC.

PLC maintains that the plain meaning of the language is simply that a fuel adjustment that is the same for both the "C" and "D" charge is excluded from the calculation. Furthermore, because the fuel adjustment cannot possibly be "common to both", (the fuel adjustment rate for the LPC site Specific rate was in fact higher than the rates it would receive under the standard HLFS rate), the fuel adjustment should be included in the calculation of the amounts owed to FSI.

PLC has submitted the Affidavit of Maurice Brubaker whom it has retained as an expert witness in the field of energy regulation and economics. In Brubaker's affidavit, he attests to the

8

work he has performed in this matter and has calculated the costs of LPC's energy under the old

HLFS rate and the new Site-Specific rate, including the costs of fuel adjustments. His calculations

comport with those performed by LPC's accountant, Richard Cisneros. More importantly, Brubaker

attests to the fact that the fuel adjustment is different for the HLFS rate and the Site-Specific rate,

and has been since order of the Louisiana Public Service Commission ("LPSC") in 1997. FSI does

not submit any evidence to dispute Mr. Brubaker's declarations.

Brubaker's Affidavit declares that he priced the electricity purchased by LPC at Entergy's

standard tariff rate, which is the HLFS. He reviewed the actual invoices rendered to LPC by Entergy

and then priced the actual quantities at the HLFS rate instead of the Site-Specific rate. In addition

to the base tariff charges in the HLFS rate that apply to the billing demand and the kilowatt hours,

LPC is subject to a fuel adjustment factor, which passes on to customers the costs Entergy incurs for

fuel and purchased power. For standard tariff customers, the fuel adjustment is loss differentiated

by voltage level, which means that the price is lower at higher voltages than at lower voltages.[25]

A proper comparison of charges under the Site-Specific rates to charges that would have

---

[25] The source of the data used for the calculations was the public-available tariffs and
fuel adjustment factors of Entergy Gulf States, Inc. that are on file with the LPSC. It was
necessary to determine the appropriate fuel adjustment factor because LPC is served at a high
voltage transmission level, and when power is supplied under the standard tariff, customers
served at this voltage level are entitled to a fuel adjustment factor that is lower than the average
factor in order to reflect the lower losses incurred in supplying service at this voltage level. The
fuel adjustment factor applied under LPC's special Site-Specific Rae does not reflect the lower
losses associated with service at the transmission voltage level. PPSC's policy is not to provide
the benefits of a line loss differentiated fuel adjustment factor to Site-Specific Rate customers.
This policy was expressed in the Commission's generic Fuel Adjustment Clause Order (Docket
No. U-21497, dated October 1, 1997).Unless special permission is sought from, and granted by
the Commission on the basis of exceptional circumstances, the fuel adjustment factor that applies
to Site-Specific Contracts is the factor that is based on system average losses, and not the lower
factor which recognizes that lower losses occur when service is rendered at higher voltage levels.
Plaintiff's Exhibit C, Affidavit of Brubaker, ¶ 5.

been applicable under the standard tariff, requires use of the lower fuel adjustment factor that is applicable when the standard tariff (HLFS) is used.[26]

Brubaker determined the fee which should have been payable to FSI as a result of the new savings under the Site-Specific Rate as compared to the standard rate, and concluded that LPC had overpaid FSI by $131,866.00.

As a side note, but of equal significance, Cisneros' and Brubaker's calculations take into consideration a payment made by a third party to LPC in the amount of $140,000.00 that is allegedly related to the dispute at issue. LPC denies that FSI is due any credit for the payment, and only for purposes of this motion for partial summary judgment, LPC concedes that FSI is due credit for this payment.

FSI argues that because the word "common" has different meanings, such as "occurring or appearing frequently", "ordinarily" or "usual", there are other permissible inferences suggested by the phrase "excluding applicable taxes and fuel adjustments common to both C & D rates." However, such inferences would render meaningless the words "to both C & D rates." "[T]he intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement."[27]  Where contract language is clear and unambiguous, the focus of a court's interpretation is "upon the terms of the agreement as manifestly expressed, rather than as, perhaps,

---

[26]  Plaintiff's Exhibit, Affidavit of Brubaker, ¶ 6.

[27]  *Steuart v. McChesney,* 444 A.2d 659, 661, 498 Pa. 45 (Pa. 1982), citing *Estate of Breyer,* 475 Pa. 108, 379 A.2d 1305 (1977).

silently intended."[28] Moreover,

> [w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.[29]

When LPC entered into the Site-specific rate with Entergy, it understood, albeit incorrectly, that the fuel adjustments for the old and new rates (C & D) were the same, hence, they were common to both the C rate and the D rate. This factual error caused LPC to exclude the fuel adjustments. In late 2004, Entergy informed LPC that in fact, the fuel adjustments for the C and D rates were not the same, hence, because they were not common to both, they should not have been excluded in the calculations. FSI has failed in its attempt to create an ambiguity where none exists. The Court concludes that the phrase, "excluding applicable taxes and fuel adjustments common to both C & D rates," means exactly what it says – when the fuel adjustments for both C and D rates are the same, they are excluded.

*Dismissal of FSI's Counterclaim*

In its Answer and Counterclaim, FSI claims that LPC breached the Agreement by failing to and/or refusing to honor its contractual obligations owed to FSI. FSI claims that it is entitled to be reimbursed for time and materials expended. To support its argument, FSI relies on the following provision in the Agreement:

> Energy strategies developed by FSI for LPC shall be implemented by LPC, at LPC's sole discretion based on their economic value to the plant. If strategies developed by

---

[28]  *Steuart,* 444 A.2d at 661.

[29]  *East Crossroads Center, Inc. v. Mellon-Stuart Co.,* 416 Pa. 229, 230-231, 205 A.2d 865, 866 (1965).

11

FSI are not implemented for reasons outside the control of FSI, despite their economic benefit to the plant, then FSI will be compensated according to a fixed fee or hourly schedule agreed to by FSI and LPC.[30]

LPC seeks to have the counterclaim dismissed because (1) there was no written modification and the agreement specifically prohibits oral modification, (2) the above mentioned provision of the Agreement has not been triggered because LPC in fact implemented one of the energy strategies recommended by FSI, or (3) the Agreement does not provide for such payment when LPC decided to terminate its contract with Entergy after 4 years and 5 months of a five year contract.

FSI argues that because LPC chose not to build a co-generation plant, one of the proposals made by FSI, the fixed fee or hourly schedule is triggered, and FSI is entitled to be compensated accordingly. FSI submits the deposition testimony of Dave Gati who testified that the Co-generation plan developed by FSI represented an option that would have provided LPC with greater savings than the savings expected from re-negotiating an energy rate contract with Entergy.[31]  Gati further admits that implementation of the Co-generation option by LPC was something over which FSI had no control.[32]  Thus, FSI argues, this testimony establishes that the fixed fee or hourly schedule reimbursement provision is triggered.

FSI developed and recommended energy strategies for LPC.  The reimbursement provision states that LPC has the sole discretion to implement  the strategies based on their economic value to the plant.   The reimbursement provisions clearly and unambiguously state that if strategies are not implemented, FSI will be compensated according to a fixed fee or hourly schedule.  However,

---

[30]  Plaintiff's Exhibit A, Depo. of Fetter, exhibit 10, p. 4.

[31]  Defendant's Exhibit C15-C16.

[32]  Defendant's Exhibit C16.

12

the provision does not provide that all strategies must be implemented.  LPC, in fact, chose one of the strategies developed and recommended by FSI - a negotiated contract with Entergy based on a Site-Specific Rate. This is undisputed.  It is obvious to this Court, that the purpose of this provision was to compensate FSI if none of the strategies developed and recommended by FSI were implemented by LPC.  Thus, the Court finds that the fixed fee and hourly schedule provision of the Agreement was not triggered.  Because the Court makes this finding, we find it unnecessary to determine if the fixed fee and hourly schedule was ever accepted by LPC, or if a modification to the contract regarding such schedule was made.

## CONCLUSION

Based on the foregoing, the motion for partial summary judgment filed by Louisiana Pigment Co., LP will be granted entitling LPC to a refund of the overpayment in the amount of $131,866.00 and dismissing FSI's counterclaim for breach of contract.  The motion for summary judgment filed by Foundation Systems, Inc. will be denied.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this _15th_ day of March, 2007.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

13